## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ENDALE TEREDA,**
5253 Dunstable Lane
Alexandria, Virginia 22315,

            Plaintiff,

    v.

**SUNNY'S EXECUTIVE SEDAN**
**SERVICE, INCORPORATED,**
23765 Pebble Run Place, Suite 100
Sterling, Virginia 20166,

       AND

**SHAFQAT IQBAL CHAUDRY,**
835 Seneca Drive
Great Falls, Virginia 22066,

           Defendants.

Case No.:

### COMPLAINT

1.    Plaintiff Endale Tereda ("Plaintiff") by and through undersigned counsel, hereby submits his Complaint against Defendants (1) Sunny's Executive Sedan Service, Incorporated, and (2) Shafqat Iqbal Chaudry, aka "Sunny" (collectively "Defendants"), to recover damages under the Federal Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201 *et seq.* (hereinafter "FLSA"), D.C. Minimum Wage Act Revision Act of 1992, D.C. Code §§ 32-1001 *et seq.* ("DCMWA") and damages for fraud, breach of contract and unjust enrichment, and for other relief as set forth below.

## PARTIES AND JURISDICTION

2.      Plaintiff Endale Tereda is an adult resident of the Commonwealth of Virginia and has been employed by Defendants as a sedan and/or seven (7) passenger sport utility vehicle ("SUV") chauffeur from on or about February 2009 to the present.

3.      Upon information and belief, Sunny's Executive Sedan Service, Incorporated is a corporation formed under the laws of the State of Virginia on or about October 18, 1995, with its principle place of business in Sterling, Virginia.

4.      At all times relevant, Sunny's Executive Sedan Service, Incorporated substantially and continuously operated in the District of Columbia.

5.      At all times relevant, Sunny's Executive Sedan Service, Incorporated was Plaintiff's "employer" for purposes of the FLSA, DCMWA, and all other claims made herein.

6.      Upon information and belief, Shafqat Iqbal Chaudry is the President, primary owner, and in charge of the day-to-day operations of Sunny's Executive Sedan Service, Incorporated.

7.      At all times relevant to this action, Shafqat Iqbal Chaudry was Plaintiff's ultimate supervisor and made all decisions relating to Plaintiff's rate and method of pay.

8.      At all times relevant, Shafqat Iqbal Chaudry was Plaintiff's "employer" for purposes of the FLSA, DCMWA, and all other claims made herein.

9.      At all times relevant, Defendants were engaged in commerce or in the production of goods for commerce in the District of Columbia and within the meaning of § 3(s)(1) of the FLSA (29 U.S.C. § 203(s)(1)).

10.     At all times relevant, Defendants qualified as an "enterprise" within the meaning of § 3(r) of the FLSA (29 U.S.C. § 203(r)).

11.     At all times relevant, Plaintiff was an individual employee engaged in commerce or the production of goods for commerce as required by 29 U.S.C. §§ 206-207.

12.     This Court has jurisdiction over this matter pursuant to § 16(b) of the FLSA, 29 U.S.C. § 216(b), and 28 U.S.C. §§ 1331 and 1337 relating to "any civil action or proceeding arising under any Act of Congress regulating commerce."

13.     This Court has supplemental jurisdiction over the related common law claims pursuant to 28 U.S.C. § 1367(a).

14.     Plaintiff's state common law claims are closely related to Plaintiff's federal claim, as all of Plaintiff's claims share common operative facts.  Resolving all federal and state claims in a single action serves the interests of judicial economy, convenience and fairness to the parties.

15.     Venue is proper pursuant to 28 U.S.C. § 1391(b).

### Plaintiff Was At All Times An Employee

16.     Prior to November 2011, Defendants had created and required Plaintiff to sign or otherwise appear to agree to an "Independent Contract Agreement" ("ICA") that purported to provide the drivers with the potential to realize gain or loss through each driver's own efforts using vehicles leased from Defendants.

17.     In fact, at all times throughout Plaintiff's employment with Defendants, Plaintiff was an employee of Defendants and was never an independent contractor.

18.     The ICA functioned and was intended by Defendants to function as "window dressing" while facilitating Defendants' scheme to underpay its employees and to avoid other legal obligations employers must comply with, including payment of various tax and social security obligations and worker's compensation insurance.

19.     Defendants' ICA was in effect until November 2011.  Under the initial ICA that Defendants appeared to issue to Plaintiff, but which Defendants deliberately refused to date, Plaintiff was told that he was a "CONTRACTOR . . . a self-employed professional chauffeur for tax purposes."

20.     As a result of this purported "non-employee" relationship, Defendants told Plaintiff that Defendants were not responsible for "withholding taxes, F.I.C.A. taxes, highway use taxes, unemployment compensation taxes, worker's compensation insurance, or any other taxes or obligations."

21.     Upon information and belief, Defendants failed to comply with any of these legally mandated employer obligations.

22.     As a result of Defendants' deliberate and improper misclassification scheme, Plaintiff was not provided with credit towards social security, drivers injured on the job were not provided with any worker's compensation, and Defendants were able to compete unfairly against other limousine services companies that provided the requisite employee benefits.

23.     Under the initial ICA, Plaintiff was required to use Defendants' equipment, wear Defendants' prescribed "uniform," and meet other standards that Defendants set.

24.     Plaintiff was told and understood that he would receive assignments conditioned on his compliance with Defendants' rules, including his willingness to work within schedules Defendants set, and on his willingness to keep the vehicles in geographic locations that Defendants required and which benefited Defendants during the drivers' mandated work schedules.

25.     To provide customers with around-the-clock coverage they marketed to consumers, Defendants generally scheduled Plaintiff to work in twelve-hour (12) shifts, six days

each week.

26.     Under the initial ICA, although Plaintiff purportedly leased from Defendants the limousines he was supposedly driving as Defendants' independent contractor (Defendants even created purported vehicle lease forms), Plaintiff did not actually lease Defendants' limousines, did not pay a lease amount, and did not actually determine how and when the limousines he drove (sedans and seven-passenger SUVs) could be used.

27.     Defendants told Plaintiff that he was not permitted to use Defendants' vehicles to service passengers that Plaintiff might identify independent of Defendants' dispatching services and Plaintiff understood that he would suffer (and on occasion did suffer) retaliation, by way of reduced dispatcher assignments, if he violated Defendants' rules.

28.     Additionally, Plaintiff was required to return the limousine and Defendants' other property, including cell phones and pagers (communication devices for which Plaintiff was separately assessed a usage fee), within twenty-four (24) hours of any ICA's termination.

29.     Initially, Plaintiff was told that "For the use of CONTRACTOR'S SERVICES, the COMPANY shall pay the CONTRACTOR 50% of the amount charged to COMPANY'S customer, exclusive of administrative fees and taxes."

30.     Plaintiff was also told that customers paid an 18% tip (using a credit card), half of which would be paid to each driver.

31.     In fact, unbeknownst to Plaintiff, Defendants were not paying Plaintiff even this promised amount.

32.     Defendants and employees or agents under their control routinely told Plaintiff and other chauffeurs they employed that Defendants charged their passengers considerably less than passengers actually were charged, thereby allowing Defendants to keep thousands of dollars

5

promised and owed to Plaintiff and other chauffeurs.

33.     Defendants were able to facilitate this deception by charging passengers' credit cards a higher amount than the amount Defendants reported to Plaintiff and to other chauffeurs when passengers called into Defendants' company to reserve a limousine.

34.     Defendants acted to prevent Plaintiff from seeing or otherwise from discovering customers' actual charges, and then regularly and routinely reported, falsely, lower customer charges to the drivers, including to Plaintiff, on their bi-weekly pay statements.

35.     Defendants changed some of the language of the initial ICA in a revised ICA that Defendants also deliberately and routinely left undated.

36.     The revised ICA explicitly required Plaintiff to hold himself out to the public as an independent contractor doing business with the COMPANY and not as an employee of the COMPANY," and in the revised ICA the previously mandated dress code was termed "suggested."

37.     Although the revised ICA indicated that its term "shall commence in the effective date as indicated below and shall terminate in twelve (12) months from that date, at which time an additional Agreement will be negotiated between the parties[,]" the revised ICA indicated no effective date.

38.     The revised ICA also modified the language concerning drivers' compensation, now stating that "For use of CONTRACTOR'S services, COMPANY shall pay CONTRACTOR 50% of the COMPANY'S then-current driver's rate sheet, exclusive of administrative fees, voucher fees, any other charges levied to the customer, fuel surcharges, and taxes."

39.     Although the language was different, Defendants told Plaintiff and other drivers Defendants employed that the new language was not intended to change their compensation.

40.     Defendants told Plaintiff and other drivers that Plaintiff's rate sheet conformed to what Plaintiff's driver's passenger was actually paying for each chauffeured trip and that Plaintiff's percentage-based compensation was thus not changing in the revised ICA from what Plaintiff had previously been told he was actually receiving, *i.e.*, 50% of the fare rate that each customer paid and 50% of the tip.

41.     In fact, because Defendants had been cheating Plaintiff all along by withholding and not reporting portions of the fares and gratuities Defendants had been charging to passengers, consistent with Defendants' representations to Plaintiff that his compensation was not intended to change as a result of the revisions to the compensation language, Plaintiff's compensation did not appear to change after the ICA's revision and in reliance on Defendants' representations and conduct, Plaintiff continued to provide chauffeur services so Defendants' customers.

42.     Furthermore, Plaintiff was never provided with a separate "driver's rate sheet" when he was presented with his so-called "Independent Contractor Agreements" and, upon information and belief, such a rate sheet actually existed.

43.     Defendants told Plaintiff that Defendants were compensating Plaintiff using fare rates that were based on market conditions and Defendants even adjusted the rates upward on at least one occasion, purportedly to reflect a market survey that Defendants had conducted.

44.     In reliance on Defendants' representations that Plaintiff was being paid half of each fare charged to his passengers, Plaintiff agreed to work and did in fact work and continue to work for Defendants.

45.     At all times while Plaintiff was employed by Defendants as a so-called independent contractor, Defendants controlled all aspects of Plaintiff's job duties through threats

and strictly enforced employment rules and through the ability to withhold assignments from Plaintiff if he failed to comply with Defendants' employment rules.

46.     Defendant hired Plaintiff and, at all times, had the ability to discipline Plaintiff, fine Plaintiff, fire Plaintiff, and adjust Plaintiff's schedule.

47.     Defendants, at all times, supervised Plaintiff's work duties to make sure Plaintiff's job performance was of sufficient quality and to ensure that Defendants' limousines were continuously disbursed throughout the Washington, D.C. metropolitan area and thus ready and available on short notice to retrieve and transport new (short notice) fares.

48.     At all times while Plaintiff was employed, Plaintiff's pay and opportunity for wages was limited to the pay method and work schedules set exclusively by Defendants.

49.     Defendants controlled all aspects of setting and enforcing Plaintiff's work schedule.

50.     Plaintiff did not share in the profits of Defendants.

51.     At no time did Plaintiff make a financial investment in Defendants' company or any equipment belonging to Defendants.

52.     To perform the work duties that Plaintiff performed for Defendants, Plaintiff did not have or need any required certificate, education, or specialized training (other than a drivers license).

53.     At all times while Plaintiff was employed, Defendants were in the business of operating a sedan and limo service and at all times Plaintiff's job duties for Defendants were directly related to providing limo and sedan driving services for Defendants' customers.

54.     Upon information and belief, by 2011, Defendants became convinced that they could no longer successfully maintain to government regulatory, taxing and/or law enforcement

officials that the sedan and SUV drivers they employed were in fact independent contractors.

55.     In about November 2011, Defendants forced Plaintiff and other sedan and SUV chauffeurs to sign new employment agreements or face termination.

56.     The purported compensation of Plaintiff changed from the 50% of the book rate for each trip that Defendants told Plaintiff he had been paid to 40%, and Plaintiff was told that as an employee he also would keep all (100%) of the gratuity charge assessed to his passengers.

57.     But, even after finally and properly characterizing Plaintiff as an employee, Defendants continued to misrepresent to Plaintiff what passengers actually were charged, understating the actual charges, and thereby skimming not just from the 40% that Plaintiff was told he would be paid, but skimming from Plaintiff's gratuities, too.

58.     Additionally, even after Defendants began to characterize Plaintiff as an employee, the remaining conditions of Plaintiff's employment did not materially change.

59.     Plaintiff was still required to pay out of his own pocket for Defendants' business and operating expenses, including for fuel (notwithstanding that passengers were charged a fuel surcharge), for radio dispatching expenses, and for car washings.

60.     Additionally, Plaintiff receive no compensation for numerous other services he was required to provide to Defendants, such as time spent on vehicle maintenance, time spent on vehicle inspection and registration, and time spent traveling to locations to retrieve Defendants' vehicles.

## Plaintiff Is Owed Substantial Damages
## Under The FLSA And DC Law

61.     Plaintiff has been employed by Defendants as a sedan/SUV driver from about February 2009 through the present.

62.    At all times during the period of Plaintiff's employment, Plaintiff performed work duties or was contractually engaged to be waiting to perform work duties for at least seventy-two (72) hours per week, and for longer periods as job assignments extended beyond set schedules.

63.    Other compensable work that Plaintiff performed primarily for the benefit of Defendants included, but was not limited to, time spent traveling to dispatched assignments, time spent washing, servicing and maintaining cars, time spent during licensing inspections, or time spent retrieving cars from delivery locations that included travel to Baltimore and to New Jersey.

64.    With regard to Plaintiff's duties for which Plaintiff was contractually engaged to be waiting, individual Defendant Shafqat Iqbal Chaudry, aka "Sunny" and employees or agents under Defendants' control personally instructed and demanded that, while Plaintiff was awaiting calls from Defendants' dispatcher, it was Plaintiff's strict work responsibility to remain at specific landmarks or locations or in specific geographic areas primarily in or around Washington, D.C., and Plaintiff was required at all times during Plaintiff's shift to physically remain in or around Defendants' provided vehicle primarily in or around Washington, D.C.

65.    Maintaining their fleet in various locations about the District of Columbia allowed Defendants to respond to last-minute reservations quickly, thereby ensuring that transportation jobs were not forfeited to other limousine operators or to taxicab drivers.  But Defendants did not obtain proper licenses from the District of Columbia that would lawfully permit their drivers to pick up and drop of fares in the District of Columbia.  To circumvent the licensing requirement, Defendants told drivers, including Plaintiff, to make false entries on the manifests the drivers were required to prepare.

66.    Defendants enforced that Plaintiff remained at specific landmarks or in or around Plaintiff's vehicle in or around specific geographic areas through a closely monitored GPS

system on Plaintiff's vehicle and/or on work phone for which Plaintiff was required to pay.

67.     Additionally, if Plaintiff did not comply with Defendants' requirement that during his scheduled shift he was available to shuttle customers in and around the Washington, D.C. metropolitan area, Plaintiff would be punished through removal for a time from Defendants' dispatcher's call list and thus he would receive no or substantially reduced income during a scheduled work period.

68.     Upon information and belief, a substantial portion of Defendants' income derived from formal and informal limo and sedan service contractual relationships they had with specific hotels and large employers in Washington, D.C.

69.     Thus, Plaintiff remaining in or around his vehicle at specific landmarks or in or around specific geographic areas primarily in Washington, D.C. insured that Defendants could quickly provide limo and sedan services at all times during Plaintiff's shift and Plaintiff was immediate availability to perform such work duties primarily for Defendants' benefit.

70.     Defendants' requirement that Plaintiff remain in or around his sedan/SUV limo at specific landmarks and in specific geographic areas, and their willingness to punish Plaintiff in the event that he was disobedient prevented Plaintiff from going home or otherwise attending to personal errands during his shift.

71.     Defendants continuously and stringently instructed that Plaintiff was on Defendants' time during his shift and must remain available in the District of Columbia to perform work duties for Defendants' benefit, and more than fifty percent (50%) of the time Plaintiff spent working for Defendants each week was spend in the District of Columbia.

72.     During the period of Plaintiff's employment, Plaintiff regularly and customarily worked about seventy-two (72) or more hours per week and Defendants suffered or permitted

Plaintiff to work about seventy-two (72) or more hours per week.

73.     Defendants had knowledge of all hours Plaintiff worked because Defendants personally set Plaintiff's work schedule and monitored Plaintiff and other drivers through GPS tracking to ensure that Defendants had knowledge of all hours that Plaintiff worked each day and week and the locations from where Plaintiff was working.

74.     At all times during Plaintiff's employment, Defendants purported to pay Plaintiff as a "piece-rate" employee, initially in the amount of fifty percent (50%) of what Defendants allegedly charged customers per trip, not including tips, and after November 2011 in the amount of forty percent (40%) of what Defendants allegedly charged customers per trip—not including gratuity charges.

75.     Throughout Plaintiff's employment, however, Plaintiff did not receive all "piece-rate" wages as set forth above but rather received compensation in a substantially lower amount.

76.     In a typical week, Plaintiff might earn piece-rate wages in the amount of or about approximately six hundred fifty dollars ($650.00) even though he worked seventy-two (72) or more hours per week.

77.     Each week throughout Plaintiff's employment, Defendants required Plaintiff to pay for Defendants' work costs including gasoline and tolls, amounting weekly to approximately three hundred dollars ($300.00), and Defendant did not reimburse Plaintiff for these amounts Plaintiff paid.

78.     Each week throughout Plaintiff's employment, Defendants also required Plaintiff to pay for Defendants' dispatch communications system, charging Plaintiff approximately $56.00 bi-weekly for radios and/or cell phones that Defendants used to communicate with Plaintiff and to dispatch Plaintiff to various chauffeur assignments.

79.     The consequence of Defendants' failure and refusal to reimburse Plaintiff for gasoline and tolls was that Plaintiff's actual received compensation was actually reduced to, approximately, at least three hundred fifty dollars ($300.00) per week ($650.00 per week "piece-rate" – $300.00 for gas/tolls / $56.00 for radio = approximately $350.00).

80.     The maximum-hours provision of the FLSA and DCMWA require employers to pay any employee who is covered by the Act "not less than one and one-half times the *regular rate* at which he is employed" for all hours worked in excess of forty in a week. 29 U.S.C. § 207(a)(1) (emphasis supplied).

81.     According to Department of Labor regulations and Supreme Court precedent, the "regular rate" of pay for FLSA purposes is an "actual fact" that "must be drawn from what happens under the employment contract," rather than from any agreement between the employer and employee. 29 C.F.R. § 778.108. "Once the parties have decided upon the amount of wages and the mode of payment[,] the determination of the regular rate becomes a matter of mathematical computation, the result of which is unaffected by any designation of a contrary, 'regular rate' in [a] wage contract [ ]." *Walling v. Youngerman-Reynolds Hardwood Co.,* 325 U.S. 419, 424-25 (1945).

82.     Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working forty (40) hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act *if* the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, *and if* he receives extra compensation, in addition to such salary, for all overtime hours worked

at a rate not less than one-half his regular rate of pay. *Hunter v. Sprint Corp.*, 453 F. Supp.2d 44, 58 (D.D.C. 2006).

83.     At no time during the period of Plaintiff's employment did Plaintiff and Defendants reach, or even engage in any discussions relating to, a clear and mutual understanding that Plaintiff's wages were intended to compensate Plaintiff at a regular non-overtime rate of pay for hours worked each week less than forty (40) and at a different overtime rate of one-and-one-half (1½) times Plaintiff rate of pay for hours worked each week in excess of forty (40).

84.     At no time during the period of Plaintiff's employment as a sedan/SUV chauffeur did Defendants ever, in addition to Plaintiff's flat wages, pay extra wages to Plaintiff for overtime hours worked in excess of forty (40) at a rate not less than one-half Plaintiff's regular rate of pay.

85.     In legal truth, Defendants paid Plaintiff their flat salary for only non-overtime hours worked each week (those less than forty (40)) and paid Plaintiff no wages at all for hours worked each week in excess of forty (40).

86.     Defendants should have paid Plaintiff at the rate of one-and-one-half (1½) times Plaintiff's regular rate of pay for all hours worked each week in excess of forty (40).

87.     At no relevant time during Plaintiff's employment did Plaintiff perform work duties that would make Plaintiff exempt from the overtime requirement of the FLSA or DCMWA.

88.     For each week that Plaintiff worked, Plaintiff is owed unpaid overtime wages in the amount of $420.16 ($350.00 per week / forty (40) hours per week = $8.75 per hour (regular rate) * 1.5 = $13.13 (overtime rate) * 32 overtime hours per week = $420.16 in unpaid overtime

wages per week).

89.     An employer who violates the FLSA or DCMWA overtime provisions is ordinarily "liable to the employee or employees affected in the amount of their unpaid minimum wages ... and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b).

90.     Here, Defendants' failure to pay Plaintiff overtime wages as required by Federal and District of Columbia Law was not the product of good faith and Defendants had no reasonable grounds for believing their failure to pay Plaintiff overtime compensation at the legal rate was in compliance with Federal or District of Columbia law.

91.     Defendants cannot meet their burden of an affirmative showing to avoid the imposition of liquidated damages.  As such, in addition to Plaintiff's entitlement to unpaid overtime wages, Plaintiff is also entitled to liquidated damages in an equal amount.

## Equitable Tolling Should Apply For The Entire
## Period Of Plaintiff's Employment With Defendants

92.     At all times during the course of Plaintiff's employment with Defendants, Defendants did not post or otherwise make visible or available in a conspicuous location at Defendants' place of business any poster or information that notified Plaintiff of the Federal or District of Columbia Minimum Wage requirement.

93.     At all times during the course of Plaintiff's employment with Defendants, Defendants did not post or otherwise make visible or available in a conspicuous location at Defendants' place of business any poster or information that notified Plaintiff of the Federal or District of Columbia Overtime pay requirement.

94.     At all times during the course of Plaintiff's employment with Defendants, Defendants did not post or otherwise make visible or available in a conspicuous location at Defendants' place of business any poster or information that notified Plaintiff of any

15

enforcement remedies available to him if he was not paid by Defendants as required by Federal and District of Columbia Law, including notification that the Department of Labor may recover back wages on behalf of employees or that underpaid employees like Plaintiff could initiate a private right of action against Defendants for nonpayment or underpayment of wages in violation of Federal and District of Columbia Law.

95.     At all times during the course of Plaintiff's employment with Defendants, Defendants did not post or otherwise make visible or available in a conspicuous location at Defendants' place of business any poster or information that notified Plaintiff of the fact that Federal and District of Columbia Law prohibits discriminating against or discharging workers who file a Complaint or participate in any proceeding to recover unpaid or underpaid wages under Federal or District of Columbia Law.

96.     At all times during Plaintiff's employment, Defendants explicitly advised Plaintiff that Plaintiff was not entitled to be paid in accordance with the requirements of Federal Law and affirmatively misrepresented and deceived Plaintiff, both as to the nature of Plaintiff's employment and as to the charges actually assessed for the limousine services that Plaintiff was providing, intending to prevent Plaintiff from discovering that he was being cheated and/or defrauded.

97.     At all times during Plaintiff's employment, Defendants verbally and physically intimidated Plaintiff such that Plaintiff was afraid to take any actions to enforce his rights to unpaid and underpaid wages and unreimbursed employer expenses under applicable law, and denied Plaintiff access accurate records of charges and other information that would have permitted Plaintiff through the exercise of due diligence to discover Defendants' illegal misconduct.

98.     On or about February 5, 2013, Plaintiff filed suit as a co-plaintiff for substantially similar counts and substantially similar relief requested herein against Defendants in the United States District Court for the Eastern District of Virginia; *Amir, et al. v. Sunny's Coach Services, Inc.*, et al.; Case Number 1:13-cv-00161-CMH-TCB (hereafter, "the Virginia Litigation").

99.     Ultimately, about twenty-five (25) individuals, including Plaintiff were co-plaintiffs or otherwise joined the Virginia Litigation.

100.    Following several months of active litigation, Defendants filed a Motion to Dismiss Plaintiff and twenty-three (23) of his co-plaintiffs, without prejudice.

101.    In Defendants' Motion to Dismiss Plaintiff from the Virginia Litigation, Defendants' argued that unique factual circumstances among the twenty-five (25) co-plaintiffs or joined plaintiffs caused the Virginia Litigation to be unmanageable.

102.    In their Motion, Defendants argued that only the first named plaintiff in the Virginia Litigation should proceed in the Virginia Litigation and that each of the other twenty-four (24) plaintiffs, including Plaintiff, should re-file individually against Defendants.

103.    In response to Plaintiff's argument that a dismissal could cause prejudice to Plaintiff as to the statute of limitation issues for the amount of time that had passed while Plaintiff's case was pending, Defendants conceded that Plaintiff would have the right to argue for equitable tolling in any subsequent litigation.

104.    At oral argument on Defendants' Motion to Dismiss, the Judge, Claude Hilton, who presided over the Virginia Litigation, expressed a substantial interest in granting equitable tolling to all dismissed plaintiffs, including Plaintiff, but stated that he did not believe he had the right to grant this relief with his dismissal order and that such a decision properly belonged to the Judge in each dismissed plaintiff's subsequent litigation.

105.    At minimum, at oral argument on October 11, 2013, Defendants, through counsel, agreed and stipulated to toll Plaintiff's claims back to a re-filing date of October 11, 2013, the date of the Court's order of dismissal.

106.    In consideration of the foregoing, it is proper to toll Plaintiff's FLSA and DCMWA overtime and minimum wage claims, and his State law claims, to include the entirety of Plaintiff's employment with Defendants.

## CAUSES OF ACTION

### COUNT I
**Violation of Federal Fair Labor Standards Act**
**(Overtime)**

107.    Plaintiff realleges and reasserts each and every allegation set forth above, as if each were set forth herein.

108.    Section 207(a)(1) of the FLSA provides that no employer shall employ any of its employees for a work week longer than forty (40) hours unless such employee receives compensation for her employment in excess of the hours above specified at a rate not less than the <u>higher of</u> one-and-one-half (1½) times the regular rate at which he is employed or one-and-one half times the Federal Minimum Wage.[1]

109.    At all times, Plaintiff was an "employee" covered by the FLSA, 29 U.S.C. § 207(a)(1), and both Defendants were Plaintiff's "employers" under FLSA, 29 U.S.C. § 207(a)(2).

110.    Defendants, as Plaintiff's employers, were obligated to compensate Plaintiff at the overtime rate of one-and-one-half (1½) times <u>the higher of</u> Plaintiff's regular rate of pay or one-and-one half (1½) times the Federal Minimum Wage for all hours worked per week in excess of

---

[1] Plaintiff's overtime rate is properly calculated by (1) adding all remuneration Plaintiff received each week, including any "service charges"; (2) dividing this amount by forty (40) hours per week (creating Plaintiffs' "regular hourly rate"; and (3) multiplying Plaintiff's regular rate by 1.5.

forty (40).

111.    As set forth above, while in Defendants' employ, Plaintiff typically and customarily worked about thirty-two (32) or more hours of overtime, each week.

112.    As set forth above, Defendants have failed and refused to compensate Plaintiff properly, and as required by the FLSA, for all overtime hours worked each week in excess of forty (40).

113.    On information and belief, at all times during Plaintiff's employment, Defendants had actual knowledge of the FLSA overtime requirement.

114.    On information and belief, at all times during Plaintiff's employment, Defendants had actual knowledge that the rate and the method by which Defendants compensated Plaintiff was in direct violation of the FLSA overtime requirement.

115.    Defendants' failure and refusal to pay Plaintiff as required by the FLSA for overtime hours worked each week was willful and intentional, and was not in good faith.

WHEREFORE, Defendants are liable, jointly and severally, to Plaintiff under Count I for all unpaid overtime wages in such amounts as are proven at trial, plus an equal amount in liquidated damages, interest (both pre- and post- judgment), reasonable attorney's fees, the costs of this action, and any other and further relief this Court deems appropriate.

## COUNT II
### Violation of D.C. Minimum Wage Act Revision Act of 1992
### (Overtime)

116.    Plaintiff re-alleges and reasserts each and every allegation set forth above, as if each were set forth herein.

117.    Plaintiff was Defendants' "employee," and both of the Defendants were Plaintiff's "employer" within the meaning of the DCMWA, D.C. Code §§ 32-1001 *et seq.*

118.    The DCMWA provides that no employer shall employ any of its employees for a workweek longer than forty (40) hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than the <u>higher of</u> one-and-one-half (1½) times the regular rate at which he is employed or one-and-one half times the District of Columbia Minimum Wage.

119.    Defendants, as Plaintiff's employers, were obligated to compensate Plaintiff at the overtime rate of one-and-one-half (1½) times <u>the higher of</u> Plaintiff's regular rate of pay or one-and-one half (1½) times the District of Columbia Minimum Wage for all hours worked per week in excess of forty (40).

120.    As set forth above, while in Defendants' employ, Plaintiff typically and customarily worked about thirty-two (32) or more hours of overtime, each week.

121.    As set forth above, Defendants have failed and refused to compensate Plaintiff properly, and as required by the DCMWA, for all overtime hours worked each week in excess of forty (40).

122.    Defendants' failure and refusal to pay Plaintiffs as required by the DCMWA was willful and intentional, and was not in good faith.

WHEREFORE, Defendants are liable, jointly and severally, to Plaintiffs under Count II, for all unpaid wages in such an amount to be proven at trial, plus liquidated damages in an equal amount, interest (both pre- and post-judgment), attorney's fees, costs, and any other and further relief this Court deems appropriate.

### COUNT III
**Violation of Federal Fair Labor Standards Act**
**(Minimum Wage)**

123.    Plaintiff re-alleges and reasserts each and every allegation set forth above as if

each were set forth herein.

124.    Section 206(a)(1) of the FLSA provides that no employer shall employ any employee for an hourly wage of less than the Federal Minimum Wage, $7.25 per hour.

125.    At all times, Plaintiff was an "employee" covered by the FLSA, 29 U.S.C. § 206(a)(1).

126.    At all times, both Defendants were Plaintiff's "employer" under the FLSA.

127.    Defendants, as Plaintiff's employers, were obligated to compensate Plaintiff for all non-overtime hours worked at an hourly rate not less than the Federal Minimum Wage.

128.    If, in the alternative, the Court determines Plaintiff's total weekly remuneration was intended to compensate Plaintiff for all hours worked then Plaintiff's regular hourly rate, at all times during Plaintiff's employment, would have been less than the Federal Minimum Wage of $7.25 per hour ($350.00 per week / seventy-two (72) hours per week = $4.86 per hour).

129.    On information and belief, at all times during Plaintiff's employment, Defendants had actual knowledge of the FLSA minimum wage requirement.

130.    On information and belief, at all times during Plaintiff's employment, Defendants had actual knowledge that the rate and the method by which Defendants compensated Plaintiff was in direct violation of the FLSA minimum wage requirement.

131.    Defendants' failure and refusal to pay compensation to Plaintiff as required by the FLSA was willful and intentional, and not in good faith.

WHEREFORE, Defendants are liable, jointly and severally, to Plaintiff under Count III for unpaid minimum wages in such amounts as are proven at trial, plus an equal amount in liquidated damages, interest (both pre- and post-judgment), attorney's fees, the costs of this action, and any other and further relief this Court deems appropriate.

## COUNT IV
### Violation of D.C. Minimum Wage Act Revision Act of 1992
### (Minimum Wage)

132.   Plaintiff re-alleges and reasserts each and every allegation set forth above as if each were set forth herein.

133.   On information and belief, at all times during Plaintiff's employment, Defendants had actual knowledge that the rate and the method by which Defendants compensated Plaintiff was in direct violation of the FLSA minimum wage requirement.

134.   At all times, Plaintiff was an "employee" covered by the DCMWA.

135.   At all times, both Defendants were Plaintiff's "employer" under the DCMWA.

136.   Defendants, as Plaintiff's employers, were obligated to compensate Plaintiff for all non-overtime hours worked at an hourly rate not less than the District of Columbia Minimum Wage.

137.   If, in the alternative, the Court determines Plaintiff's total weekly remuneration was intended to compensate Plaintiff for all hours worked then Plaintiff's regular hourly rate, at all times during Plaintiff's employment, would have been less than the District of Columbia Minimum Wage of $8.25 per hour ($350.00 per week / seventy-two (72) hours per week = $4.86 per hour).

138.   Defendants' failure and refusal to pay compensation to Plaintiff as required by the DCMWA was willful and intentional, and not in good faith.

WHEREFORE, Defendants are liable, jointly and severally, to Plaintiff under Count IV for unpaid minimum wages in such amounts as are proven at trial, plus an equal amount in liquidated damages, interest (both pre- and post-judgment), attorney's fees, the costs of this action, and any other and further relief this Court deems appropriate.

## COUNT V
### (Fraud)

139.    Plaintiff re-alleges and re-asserts each and every allegation set forth above, as if each were set forth herein.

140.    During all times relevant here, Defendants have desired not to pay Plaintiff even the amounts that they had promised to pay Plaintiff for the chauffeur services Plaintiff was providing, and have desired not to reimburse Plaintiff for amounts incurred on Defendants' behalf.

141.    To avoid paying promised and owed amounts while inducing Plaintiff to work and to continue working for Defendants, Defendants concocted a scheme whereby they would intentionally mischaracterize the nature of each driver's employment relationship, would report to Plaintiff a different amount than the amount actually charged to customers for the provision of limousine services while telling Plaintiff that he was being paid a percentage of what the market would bear, and would report that the amounts paid to Plaintiff were determined based on actual and competitive market rates.

142.    Defendants told Plaintiff that his compensation was based a percentage of the market rate for each trip, which rate customers were allegedly paying, but Defendants knew that their representations to Plaintiff were not true.

143.    In falsely reporting to Plaintiff and the other drivers Defendants employed a different amount than the amount actually collected from passengers, Defendants agreed and conspired with other employees or other persons otherwise engaged to perform payroll/bookkeeping services to ensure that amounts reported to Plaintiff as actual customer charges were, in fact, uniform (even when fares were not) and that the amounts reported to drivers as charged were consistently lower that the amounts Defendants actually charged to

customers.

144.   Plaintiff reasonably relied on the statements issued by Defendants and, accordingly, did not contest the inaccuracy of his compensation or otherwise pursue legal recourse, and, instead, continued to provide chauffeur services for Defendants.

145.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered damages, including but not limited to underpayment of owed compensation and improper payment of Defendants' own business expenses.

146.   The actions of Defendants in deliberately committing fraud authorize the imposition of punitive damages, pursuant to the provisions of Virginia and District of Columbia law, in that they show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequence.

WHEREFORE, Defendants are liable, jointly and severally, to Plaintiffs under Count V for damages in such amounts as are proven at trial, as well as interest (both pre- and post-judgment), reasonable attorneys' fees, the costs of this action, punitive damages, and any other and further relief this Court deems appropriate.

## COUNT VI
### (Negligent Misrepresentation / Constructive Fraud)

147.   Plaintiffs reallege and reassert each and every allegation set forth in above, as if each were set forth herein.

148.   If the false representations of material facts by Defendants were made innocently or negligently, Plaintiff was nevertheless injured as a direct and proximate result of his reliance on representations that were false, and demands damages for constructive fraud or negligent misrepresentation.

WHEREFORE, Defendants are liable, jointly and severally, to Plaintiff under Count VI

for all damages in such amounts as are proven at trial, as well as interest (both pre- and post-judgment), reasonable attorneys' fees, the costs of this action, and any other and further relief this Court deems appropriate.

## COUNT VII
### (Breach of Contract)

149.   Plaintiffs reallege and reassert each and every allegation set forth above, as if each were set forth herein.

150.   Defendants promised Plaintiff that in return for the services he agreed to render to Defendants, Defendants would pay Plaintiff specified percentages of the amounts charged to customers, and specified percentages of the gratuities/tips customers also paid.

151.   Plaintiff was at all times in compliance with and not in breach of his contractual agreements relating to employment with and compensation from Defendants.

152.   Throughout the course of Plaintiff's employment with Defendants, Defendants failed to pay the promised compensation; instead, Defendants misrepresented to Plaintiff the amounts customers actually paid for the chauffeur services Plaintiff regularly provided.

153.   As a direct and proximate cause of Defendants' breach of their contract with Plaintiff, Plaintiff has been damaged in an amount to be determined at trial from records under Defendants' custody and control.

WHEREFORE, Defendants are liable, jointly and severally, to Plaintiff under Count VII for damages in such amounts as are proven at trial, costs, and any other and further relief this Court deems appropriate.

## COUNT VIII
### (Unjust Enrichment)

154.   Plaintiff re-alleges and re-asserts each and every allegation set forth above, as if each were set forth herein.

155.   Plaintiff provided chauffeured driver services to Defendants pursuant to a sham, unconscionable "Independent Contractor Transportation Agreement" which was at all times mentioned herein a non-negotiable contract of adhesion, drafted or imposed exclusively by Defendants and/or their legal counsel, exclusively for Defendants' benefit and containing multiple unconscionable provisions, including but not limited to:  the provisions misclassifying Plaintiff as an "independent contractor" while at all times reserving to Defendants the right to control the method and manner of work performance of Plaintiff; and the provisions requiring Plaintiff to pay an expenses of vehicles and other equipment he was required to use for Defendants' benefit; the provisions refusing to provide workers compensation insurance or coverage for Plaintiff as required by law.

156.   Defendants receive substantial benefits from Plaintiff and the Unjust Enrichment Plaintiff, who provided chauffeur services for Defendants' customers at Defendants' direction. Defendants nonetheless retained and were unjustly enrichment by the amounts they retain from their customers for the chauffeur services provided by Plaintiff, without fully reimbursing Plaintiff for the expenses of providing such service and without accurately compensating them even under the formula by which Defendants promised to abide.

157.   Defendants charge their customers a fuel surcharge for fuel paid for by Plaintiff and the Unjust Enrichment Plaintiff and receive substantial payments from customers for such fuel surcharges.  Defendants do not purchase the fuel used by Plaintiff and the Unjust Enrichment Plaintiff for the chauffeur services Plaintiff makes and which are subject to the fuel

surcharge billed to the customers.

158.   Upon information and belief, Defendants reimbursed Plaintiff no more than 25% of such fuel surcharges, and Defendants are unjustly enriched by, at a minimum, 75% of such surcharges which they levied and have retained despite not having paid for much, if any of the fuel Plaintiff has used.

WHEREFORE, Defendants are liable, jointly and severally, to Plaintiff under Count VIII for all Plaintiff's vehicle and related driving expenses, for all Defendants' retained fuel surcharges received from customers for deliveries made by Plaintiff, for that portion of actual trip fees charged to customers but not properly reported and paid to drivers, and for trip fees withheld from drivers, plus interest (both pre- and post- judgment), reasonable attorney's fees, the costs of this action, and any other and further relief this Court deems appropriate.

## COUNT IX
### (Violation of FLSA—Unlawful Retaliation)

159.   Plaintiff realleges and reasserts each and every allegation set forth above, as if each were set forth herein.

160.   FLSA section 215(a)(3) provides, in relevant part: "[I]t shall be unlawful for any person … to discharge or in any other manner discriminate against any employee because such employee has filed *any complaint* or instituted or caused to be instituted any proceeding under or related to this chapter…." (emphasis supplied).

161.   On January 18, 2013, counsel working with undersigned counsel on behalf of Plaintiff and other drivers with regard to the preparation of the Virginia Litigation sent a letter (by email and first class mail) to Jaqueline C. Tully, Esq. of Jackson Lewis LLP, the law firm representing Defendants here.

162.   In the January 18, 2013 letter, Plaintiff's counsel notified Defendants that their

chauffeur employees, including Plaintiff, had a collective action FLSA lawsuit against Defendants for unpaid standard wages and unpaid overtime wages.

163.   In the January 18, 2013 letter, Plaintiff's counsel admonished Defendants (through their counsel) that the FLSA strictly forbids any and all retaliation by an employer against an employee for asserting rights under the FLSA and advised Defendants' counsel of Defendants' obligation and responsibility to preserve all evidence (specifically including electronic evidence) relevant to the claims of Plaintiff and all other potential plaintiffs, including all plaintiffs in the Virginia Litigation.

164.   On about February 11, 2013, Plaintiff and other current and former drivers initiated the Virginia Litigation on behalf of themselves and all other similarly situated individuals alleging therein that Plaintiff and others were misclassified as independent contracts before November 2011 and even thereafter unpaid for overtime hours at the rate of one-and-one half (1½) times their regular rate of pay for hours worked each week in excess of forty (40), as required by the FLSA.

165.   Almost immediately after Defendants became aware that Plaintiff intended to enforce his legal rights under the FLSA, retaliation against Plaintiff commenced.

166.   Retaliation has taken several forms, including harassment, reduction in attractive assignments and reduction in pay as a result of reduction in assignments.

167.   Defendants have acted in bad faith in retaliating against Plaintiff for complaining to Defendants regarding Defendants prior and ongoing failure and refusal to abide by their legal obligations under the FLSA.

168.   As a result of Defendants' unlawful retaliation against Plaintiff, Plaintiff has lost wages and continues to lose wages. Plaintiff has also suffered and continues to suffer severe

mental anguish and other damages as a result of Defendants' retaliation and harassment, and retaliatory reduction of Plaintiff's wages as a result of Plaintiff's effort to collect wages Defendants owed to him under the FLSA and other applicable law.

WHEREFORE, Plaintiff prays that he be awarded judgment on Count IX of this Complaint against Defendants, jointly and severally, and receive all economic damages, compensatory damages and punitive damages available under the FLSA, as well as attorney's fees, the costs of this action, and any further relief this Court deems appropriate.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/

Gregg C. Greenberg, Bar No. MD17291
The Zipin Law Firm, LLC
836 Bonifant Street
Silver Spring, Maryland 20910
301-587-9373 (ph) / 301-587-9397 (fax)
Email: ggreenberg@zipinlaw.com

William R. Cowden, DC Bar 426301
William Cowden LLC
1150 Connecticut Avenue, NW, Ste 900
Washington, DC 20036
202-828-4100 (ph) / 202-828-4130 (fax)
Email: wcowden@cowdenllc.com

Martin F. McMahon, DC Bar No. 196642
Martin F. McMahon & Associates
1150 Connecticut Avenue, NW, Ste 900
Washington, DC 20036
202-862-4343 (ph) / 202-828-4130 (fax)
Email: mm@martinmcmahonlaw.com

*Counsel for Plaintiff*